**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

JAMES D. HINSON ELECTRICAL CONTRACTING CO., INC., BLYTHE DEVELOPMENT COMPANY, and CALLAWAY GRADING, INC., individually and on behalf of all others similarly situated; and NATIONAL UTILITY CONTRACTORS ASSOCIATION,

Plaintiffs,

v. Case No: 3:13-cv-29-J-32JRK

AT&T SERVICES, INC. and BELLSOUTH TELECOMMUNICATIONS, LLC,

Defendants.

---

**ORDER**

This case is before the Court on Defendants' Motion to Dismiss. (Mot. to Dismiss, Doc. 13.) Defendants ask the Court to dismiss plaintiffs' statutory claims under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, and the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201-213, because these claims are based on alleged "pre-litigative" activities which cannot form the basis for suit under the Noerr-Pennington doctrine or the North Carolina litigation privilege. (Id. at 1-2; Reply, Doc. 37.) Plaintiffs respond that the claims are not based on protected pre-litigative activities and that, regardless, neither the Noerr-Pennington doctrine, the protections of the First Amendment right to

petition, nor the North Carolina litigation privilege applies in this context. (Resp. 1-2, Doc. 30.) The Court held a hearing in this case on May 31, 2013, the record of which is incorporated here.[1] (Hr'g Tr., May 31, 2013, Doc. 41.) Upon review of the file, the parties' written submissions and oral presentations, and the relevant authority, the Court rules as follows.

## I. FACTUAL BACKGROUND

Plaintiffs James D. Hinson Electrical Contracting Co., a Florida corporation, Blythe Development Company, a North Carolina corporation, and Callaway Grading, Inc., a Georgia corporation,[2] are each contractors that at some point damaged underground and above-ground telecommunications cables and equipment—also referred to as "facilities"—maintained by Defendants AT&T Services, Inc. and BellSouth Telecommunications, LLC.[3] (Compl. ¶¶ 1, 5-7, 14, 23-25, Doc. 1.) Each plaintiff has received and paid bills[4] from defendants for the damage to defendants' facilities. (Id., ¶¶ 23-25.)

[1] As predicted at the hearing, this decision has been unavoidably delayed by the Court's backlog of cases.

[2] The National Utility Contractors Association, a membership organization representing utility and excavation contractors around the country, is also a plaintiff in this case. (Compl. ¶ 7, Doc. 1.) Though it purports to seek declaratory and injunctive relief on behalf its members (see id., ¶¶ 7, 42, 48, 54), it does not attempt to do so in the form of a class action (see id., ¶¶ 27-31).

[3] Unless otherwise indicated, the well-pleaded allegations of the complaint, which the Court accepts as true at this stage, Castro v. Sec'y of Homeland Sec., 472 F.3d 1334, 1336 (11th Cir. 2006); Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003), serve as the basis for this factual background.

[4] The Court refers to the documents defendants sent to damagers as "bills" merely for convenience or to reflect the allegations in the complaint, and not to indicate any predetermination on the applicability of the Noerr-Pennington doctrine.

When one of defendants' facilities is damaged, defendants typically investigate the damage and, if they identify a person or company responsible, send that person or company a bill. (Id., ¶ 14.) All bills for facilities damage are produced by computer and are in a similar form with similar charges. (Id., ¶ 17.) In addition to the cost of repairing the damaged facility, the bills include an undisclosed charge for "claims processing," which includes those costs associated with investigating claims and running defendants' claims and collections operations. (Id., ¶ 15.) The bills also include a charge for "loss of use," which is allegedly calculated by use of a common algorithm, rather than by the actual time the facility is out of service, and is applied uniformly to all bills. (Id., ¶¶ 19, 20.) Finally, the bills include additional charges potentially unrelated to repairing the damaged facility, like a charge for the cost of installing "marker balls" to help easily locate facilities in the future. (Id., ¶ 21.)

The complaint does not include as exhibits any copies of the bills, but defendants attach to their motion to dismiss copies of a bill sent to Blythe and one sent to Hinson. (Docs. 13-1, 13-2.) Each bill bears the title "Claim for Damages" at the top of the first page, followed by the damager's name and address and a short description of what facility was damaged, when, where, and how. (Doc. 13-1 at 2.) The bills then provide the amount of "LABOR COST," "MATERIALS/UNIT COST ITEMS," "CONTRACTOR," "LOSS OF USE," and "OTHER" costs, as well as a "TOTAL AMOUNT DUE." (Id.) The bill states in smaller print just above that "[t]he labor cost amount claimed includes direct costs and indirect costs, including but not limited to personnel, equipment, vehicles, administrative overheads, and an allocation

of general corporate overhead." (Id.) At the bottom third of the first page of the bill is the statement "(**** PLEASE DO NOT PAY WITH TELEPHONE BILL ****)," along with an address to which the damager should remit payment. (Id.) The very bottom of the page is a slip to be detached and returned with any payment that includes instructions about forwarding the bill to the damager's insurance carrier. (Id.)

On the second page, the bill provides a "BREAKDOWN OF CHARGES FOR DAMAGES" including information on the date and time of the repairs, the employees who worked on the repairs, the materials used, the contractor used, any purported loss of use, and other items. (Id. at 2.)

After receiving a bill, Hinson later received another copy under cover of a letter from a lawyer for the defendants including the statement that he had been authorized to sue to recover on the bill. (Doc. 13-2 at 1; Doc. 1 at ¶ 26; see Doc. 41 at 28-30.)

Plaintiffs acknowledge that defendants are entitled to recover their actual loss in repairing the damage to its facilities under state statutes like the Florida Underground Facility Damage Prevention and Safety Act ("FUFDPSA"), Fla. Stat. § 556.101-116, and under state common law. (Doc. 1 at ¶ 1.) Plaintiffs allege, however, that defendants may not recover claims processing charges, loss of use charges, or other charges, like the cost of installing marker balls. (Id., ¶¶ 1, 15-22.)

## II. PROCEDURAL BACKGROUND

### A. Hinson I

This case is a sequel to one that first came before the undersigned in 2007,

Hinson v. Bell South Communications (*Hinson I*), Case No. 3:07-cv-598-J-32MCR (M.D. Fla). There, Hinson brought claims on its own behalf[5] and on behalf of a class of Florida excavators and excavating contractors against BellSouth, challenging BellSouth's charging for and recovery of claims processing and "corporate overhead" charges, as well as loss of use charges. (Hinson I, Docs. 1, 104.) The Court eventually certified a class of excavators who paid a bill for damage to BellSouth's facilities in Florida, Hinson I, 275 F.R.D. 638, 649 (M.D. Fla. 2011), but the parties reached a settlement before the case approached trial. (See Hinson I, Doc. 196-1.) The settlement specifically reserved the class members' rights to challenge BellSouth's charges for loss of use. (Id. at ¶ 4.6; Doc. 1 at ¶ 25.)

**B. Hinson II**

In this case, Hinson II, plaintiffs have dropped any claim relating to corporate overhead charges, but have otherwise expanded their claims to include charges relating to damage to above-ground as well as underground facilities and broadened the case into a national class action with four subclasses, including one subclass of those who caused damage to facilities in North Carolina and one subclass of those who caused damage to facilities in Florida.[6] (Doc. 1 at ¶¶ 29, 31.) In Count III of the complaint, plaintiffs bring a claim on behalf of the North Carolina subclass pursuant to the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"), N.C.

---

[5] Hinson later added another named plaintiff to the suit. (Hinson I, Doc. 104)

[6] Each purported class excludes those released in Hinson I as well as those who have otherwise agreed in writing to release their claims against the defendants or to arbitrate their claims. (Doc. 1 at ¶¶ 27-31.)

Gen. Stat § 75-1.1. (Id., ¶¶ 54-59.) Count IV alleges a claim on behalf of the Florida subclass pursuant to the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201-213. (Id., ¶¶ 60-67.) Both counts allege that defendants' practice of billing and collecting charges which they were not owed is unfair, misleading, and deceptive, in violation of NCUDTPA and FDUTPA. (Id., ¶¶ 56-57, 59, 62-64.)

According to defendants, these "bills" are actually demands to resolve tort claims, and as such, are protected "pre-litigative" conduct under the First Amendment right to petition as reflected in the Noerr-Pennington doctrine. (Doc. 13 at 1, 6-8, 11-12.) Defendants contend that, under Noerr-Pennington, the Court should interpret NCUDTPA and FDUTPA to not provide liability for such protected activity. (Id. at 9-15.) But, defendants argue, even if there were liability for such activity under either statute, their demand letters were genuine attempts to resolve tort claims and therefore are protected by Noerr-Pennington. (Id. at 15-17.) Failing these arguments, defendants believe North Carolina's common law litigation privilege applies to prevent statements made in proposed litigation, like demand letters, from forming the basis for liability. (Id. at 17-18.) On these grounds, defendants move to dismiss plaintiffs' statutory claims in Count III and Count IV.

Plaintiffs respond that the basis for their statutory claims is not just billing for but also collecting the improper charges, and that the collection is not protected under Noerr-Pennington. (Doc. 30 at 2-4.) Even if the bills were the basis for liability, plaintiffs contend that the bills are not pre-litigative conduct, but were actually

designed and formatted like bills to avoid litigation. (Id. at 5-6.) Plaintiffs also read the case law to limit Noerr-Pennington to antitrust claims. (Id. at 6-8.) Moreover, plaintiffs argue that, even if First Amendment protections do apply to these kinds of claims, the protections do not cover baseless, sham petitioning activities like efforts to collect charges unrecoverable under the law. (Id. at 8-11.) Finally, for the same reason the bills are not litigative activity protected by Noerr-Pennington, plaintiffs do not believe they are protected by the North Carolina litigation privilege. (Id. at 13.) Thus, plaintiffs assert that their statutory claims should stand or, at the very least, they should be permitted to replead the claims. (Id. at 1-2, 10 n.3.)

## III. STANDARD OF REVIEW

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must accept all factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff. Castro, 472 F.3d at 1336; Hill, 321 F.3d at 1335. "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Erickson v. Pardus, 551 U.S. 89, 89 (2007). "[T]he pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation and quotation omitted). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Nor does a complaint suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" Id. (quoting

Twombly, 550 U.S. at 557.) "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. (citation and quotation omitted). Whether a complaint gives reasonable notice is a question of law. Bejil v. Ethicon, Inc., 269 F.3d 477, 481 (5th Cir. 2001); Evans v. McClain of Ga., Inc., 131 F.3d 957, 964 n.2 (11th Cir. 1997).

Though courts are generally limited in their review of Rule 12(b)(6) motions to the allegations in the complaint and any exhibits thereto, courts may consider other materials when "'(1) a plaintiff refers to a document in its complaint, (2) the document is central to her claim, (3) its contents are not in dispute, and (4) the defendant attaches the document to its motion to dismiss.'" Fuller v. Suntrust Banks, Inc., No. 12-16217, 2014 WL 718309, at *8 (11th Cir. Feb. 26, 2014) (quoting Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1284 (11th Cir. 2007)).

## IV. ANALYSIS

### A. The Noerr-Pennington Doctrine

The Noerr-Pennington doctrine provides both an immunity from antitrust liability for activities relating to efforts to influence public officials and an understanding that antitrust laws should not be read to interfere with the First Amendment right "to petition the government for a redress of grievances." United Mine Workers v. Pennington, 381 U.S. 657, 670 (1965); E. R.R. Presidents Conference

v. Noerr Motor Freight, Inc., 365 U.S. 127, 136 (1961). Though springing in part from the language of the Sherman Act, the doctrine "rests in large part on the general First Amendment guarantees of freedom to petition and freedom of association." McGuire Oil Co. v. Mapco, Inc., 958 F.2d 1552, 1562 (11th Cir. 1992). The Supreme Court and the Eleventh Circuit have recognized that the First Amendment foundations of the doctrine provide a similar immunity from liability for petitioning activity outside the antitrust context. BE & K Constr. Co. v. NLRB, 536 U.S. 516, 529-35 (2002); McGuire Oil Co., 958 F.2d at 1562; see Atico Int'l USA, Inc. v. LUV N' Care, Ltd., No. 09-60397, 2009 WL 2589148, at *2 n.2 (S.D. Fla. Aug. 19, 2009) (noting that it is more precise to refer to the First Amendment outside of the antitrust context, rather than Noerr-Pennington, but applying the same analysis to FDUTPA claims).

The right to petition and the related immunity from liability extend beyond executive or legislative officials to include efforts to influence adjudicative bodies like courts. BE & K Constr. Co., 536 U.S. at 525 (citing Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510-11 (1972)). Legitimate threats of litigation, as much as actual litigation, may be protected by these guarantees. McGuire Oil Co., 958 F.2d at 1560.

> "Given that petitioning immunity protects joint litigation, it would be absurd to hold that it does not protect those acts reasonably and normally attendant upon effective litigation. The litigator should not be protected only when he strikes without warning. If litigation is in good faith, a toke of that sincerity is a warning that it will be commenced and a possible effort to compromise the dispute."

Id. (quoting Coastal States Mktg., Inc. v. Hunt, 694 F.2d 1358, 1367 (5th Cir. 1983)). Immunity is not merely an affirmative defense; instead, the party seeking to impose

liability bears the burden "to allege facts sufficient to show that Noerr-Pennington immunity did not attach to [defendants'] actions." McGuire Oil Co., 958 F.2d at 1558 n.9.

There is an exception to Noerr-Pennington immunity, however, for "sham" petitioning activities seemingly undertaken in an attempt to influence government action, but actually done for the purpose of interfering directly with the business of a competitor. Id. at 1559; see City of Columbia v. Omni Outdoor Adver., Inc., 499 U.S. 365, 380 (1991). The sham exception "encompasses situations in which persons use the governmental *process* – as opposed to the *outcome* of the process – as an anticompetitive weapon." City of Columbia, 449 U.S. at 380. To be considered a sham, the petitioning activity 'must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits,'" and the litigant's subjective motivation must reveal an attempt to use the governmental process, rather than the outcome, as a weapon. BE & K Constr. Co., 536 U.S. at 526 (quoting Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 60-61 (1999)). As with immunity generally, the burden is on the party seeking to impose liability to show that the sham exception applies. McGuire Oil Co., 958 F.2d at 1560.

**1. First Amendment Immunity, NCUDTPA, and FDUTPA**

As a threshold issue, the parties dispute whether any immunity doctrine applies in the context of claims under NCUDTPA and FDUTPA. Plaintiffs argue no immunity applies (Doc. 30 at 1, 6-8), while defendants argue immunity does apply (Doc. 37 at 4-6).

Courts in North Carolina and Florida have held that Noerr-Pennington immunity or its First Amendment equivalent may in some cases apply to bar NCUDTPA and FDUTPA claims. Veolia Water Solutions & Techs. Support v. Siemens Indus., Inc., No. 5:11-CV-00296-FL, 2012 WL 4793472, at *3 (E.D.N.C. Oct. 9, 2012) (NCUDTPA); United States v. Ward, 618 F. Supp. 884, 907 (E.D.N.C. 1985) (same); Rolex Watch U.S.A., Inc. v. Rainbow Jewelry, Inc., No. 12-21437-CIV, 2012 WL 4138028, at *3 (S.D. Fla. Sept. 19, 2012) (FDUTPA); Atico Int'l USA, Inc., 2009 WL 2589148 at *2 (same); Marco Island Cable, Inc. v. Comcast Cablevision of the South, Inc., No. 2:04-cv-26-FTM-29DNF, 2006 WL 1814333, at *8-9 (M.D. Fla. July 3, 2006) (same).

Still, though immunity may apply to bar NCUDTPA and FDUTPA claims based on the facts of the particular case, the statutes should be read to allow for valid claims in a manner consistent with the Constitution. See McGuire Oil Co., 958 F.2d at 1562. By prohibiting only "unfair" or "deceptive" acts or practices, N.C. Gen. Stat. § 75-1.1; Fla. Stat. § 501.204, each statute provides the requisite "breathing space" for protected petitioning activity while allowing for liability for activity that falls within the sham exception. See DIRECTV, Inc. v. Cephas, 294 F. Supp. 2d 760, 767 (M.D.N.C. 2003);[7] also BE & K Constr. Co., 536 U.S. at 531.

**2. Plaintiffs' NCUDTPA and FDUTPA Claims**

Defendants argue that the "bills" they sent were actually legitimate settlement

[7] The Court does not go as far as the court in Cephas, however, to say that NCUDTPA claims per se fall within the sham exception.

demand letters and, as such, are immune from liability under the First Amendment. Plaintiffs respond that their statutory claims are not solely based on defendants' bills, but that even if they were, the documents defendants sent were truly bills designed to recover charges to which defendants were not entitled.

As pleaded, plaintiffs' NCUDTPA and FDUTPA claims in particular are necessarily based on defendants' bills. (Doc. 37 at 1.) The complaint goes into detail regarding defendants' bills and billing practice, and alleges that the bills are marked up with improper charges, some of which are not disclosed on the bills. (See, e.g., Doc. 1 at ¶¶ 1-2, 14-25, 56-57, 62-66.) Though plaintiffs argue that their statutory claims are not based solely on the bills, it is not clear what else in the complaint besides the allegedly improper billing practices would constitute "unfair" or "deceptive" trade practices in violation of either NCUDTPA or FDUTPA.

Neither side cites to any authority in which a court considered similar documents under Noerr-Pennington or First Amendment immunity.[8] Defendants suggest that the Court's holding in Hinson I—that BellSouth's claims processing work is pre-litigation and litigation activity and, therefore, not recoverable under FUFDPSA—means that these claims documents are necessarily litigative activity. (Doc. 37 at 2-3.) However, defendants did not raise, so the Court did not address, Noerr-Pennington or First Amendment immunity in Hinson I. See 796 F. Supp. 2d 1341 (M.D. Fla. 2011). Moreover, the bills attached to defendants' motion here

---

[8] The parties apparently agree that traditional pre-suit demand letters are protected pre-litigative activity. (Compare Doc. 13 at 11-12, Doc. 37 at 3, with Doc. 30 at 5.)

appear somewhat different than the bills at issue in Hinson I. Compare 642 F. Supp. 2d 1318, 1321 (M.D. Fla. 2009), with Docs. 13-1, 13-2.

With no direct legal guidance to go on, the Court concludes that, rather than determine now whether the bills are protected activity, the more prudent course is for plaintiffs to amend their complaint to address Noerr-Pennington-First Amendment immunity and the sham exception as they are so inclined,[9] for defendants to answer the amended complaint, and for the Court to instead resolve the issue following discovery and dispositive motion practice.

One final note: defendants raise questions in their Noerr-Pennington-First Amendment analysis regarding whether either NCUDTPA or FDUTPA apply to this case in the first place. (Doc. 13 at 12-15.) Indeed, opinions issued after the Court's determination in Hinson I have found that certain demand letters did not implicate "trade or commerce" under the circumstances presented in those cases. See, e.g., Acosta v. James A. Gustino, P.A., No. 6:11-cv-1266-Orl-31GJK, 2012 WL 4052245 (M.D. Fla. Sept. 13, 2012); Williams v. Nationwide Credit, Inc., 890 F. Supp. 2d 1319 (S.D. Fla. 2012); Kelly v. Palmer, Reifler & Assocs., P.A., 681 F. Supp. 2d 135, 1376 (S.D. Fla. 2010). The Court, however, finds those cases distinguishable at this stage of the case. The Court may revisit this issue, as it did in Hinson I, but is not prepared to dismiss the claims on that basis alone.

[9] Plaintiffs likely did not draft the complaint with Noerr-Pennington in mind, as the issue was never raised in Hinson I. The Court elects to exercise its discretion and allow plaintiffs to amend their complaint.

**B. The North Carolina Litigation Privilege**

Finally, because it finds that plaintiffs should replead their statutory claims for the reasons discussed above, the Court does not reach defendants' alternative grounds for dismissing plaintiffs' NCUDTPA claim based on the North Carolina common law litigation privilege.[10] (Doc. 13 at 17-18; Doc. 37 at 9-10.)

Accordingly, it is hereby

**ORDERED:**

1. Defendants' Motion to Dismiss (Doc. 13) is **GRANTED**.

2. Plaintiffs shall file an amended complaint on or before **April 18, 2014**.

3. Defendants shall file their answers to the amended complaint on or before **May 18, 2014**.

4. The Clerk is directed to enter a notice designating this case a Track Three case pursuant to Local Rule 3.05.

5. The stay of discovery entered on April 22, 2013 (Doc. 28) is hereby lifted. The Court will contemporaneously enter a separate Case Management and Scheduling Order.

**DONE AND ORDERED** at Jacksonville, Florida this 20th day of March, 2014.

TIMOTHY J. CORRIGAN
United States District Judge

---

[10] The Court does note, however, that the limited authority cited by defendants only addresses the privilege in the context of a defamation claim. See Harris v. NCNB Nat'l Bank of N.C., 355 S.E.2d 838, 841-844 (N.C. Ct. App. 1987) (holding that the litigation privilege required dismissal of plaintiff's defamation claim, but affirming dismissal of plaintiff's other claims, including a NCUDTPA claim, on other grounds).

bjb.
Copies:

Counsel of record