**Plaintiffs' Appendix of Exhibits Replied Upon
In Support of Its Motion for Class Certification
And Supporting Memorandum of Law**

# Exhibit 17

## Excerpts from the Deposition of
## Ian Ratner, taken April 3, 2015

*James D. Hinson Electrical Contracting Co., Inc., et al.
v. AT&T Services, Inc., et al.*
U.S.D.C., Middle District, Florida, Jacksonville Division
CA No. 3:13-CV-29-J-32JRK

Case 3:13-cv-00029-TJC-JRK   Document 115-18   Filed 04/21/15   Page 2 of 24 PageID 1581

James D. Hinson, et al. v. AT&T Services, Inc., et al.
Ian Ratner                                                                April 03, 2015

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JAMES D. HINSON ELECTRICAL
CONTRACTING CO., INC., et al.,

      Plaintiffs,

   vs.            CASE NO. 3:13-cv-29-J-32JRK

AT&T SERVICES, INC., et al.,

      Defendants.
_____


DEPOSITION OF

IAN RATNER


April 3, 2015

9:31 a.m.


1100 Peachtree Street, N.E.
Suite 100
Atlanta, Georgia  30309


Gala M. Reznick, RPR, CCR-B-826



Elizabeth Gallo
COURT REPORTING, LLC

www.GeorgiaReporting.com/Schedule
404.389.1155

James D. Hinson, et al. v. AT&T Services, Inc., et al.
Ian Ratner

April 03, 2015

Page 2

```
 1    APPEARANCES OF COUNSEL:

 2    On behalf of the Plaintiffs:

 3         KENNETH S. CANFIELD, Esquire
           Doffermyre, Shields, Canfield,
 4          & Knowles, LLC
           1355 Peachtree Street
 5         Suite 1600
           Atlanta, Georgia  30309
 6         404-881-8900
           kcanfield@dsckd.com
 7
      On behalf of the Defendants:
 8
           JOHN P. JETT, Esquire
 9         Kilpatrick Townsend & Stockton, LLP
           1100 Peachtree Street, N.E.
10         Suite 2800
           Atlanta, Georgia  30309
11         404-815-6020
           jjett@kilpatricktownsend.com
12

13

14

15

16

17

18

19

20                    |

21

22

23

24

25
```

Page 21

1        A     It would include an amount for overheads.

2   And one of those overheads is something that we've

3   referred to in this case as the risk management

4   overhead, which is a portion of the overhead for

5   running that department.

6        Q     Right.

7        A     That's how -- that's how I think about it.

8        Q     And risk management overhead is contained

9   within the overheads which make up the loadings on

10  the labor rates that's reflected on the bill?

11       A     That's where it's reflected within the --

12  yes.  That's where -- ultimately, that's where it

13  sits.  When you -- when you go all the way down to

14  that claim, that's where it sits.  It sits in the

15  labor.

16       Q     And the -- every bill sent to a damager

17  during the class period that had a charge for labor

18  would have also had a component for risk management

19  overhead; correct?

20       A     Yes.

21       Q     And that risk management overhead

22  component would have been calculated using the same

23  methodology for each one of those bills; right?

24                 MR. JETT:  Object to the form.

25                 THE WITNESS:  Within the time -- to

Page 22

```
1        the extent that the -- to the extent that the

2        claims are submitted at the same time, yes.

3        The modified -- the methodology -- there's

4        nuance changes in the methodology over this

5        time period.  So the answer to your question

6        is, yes, for the same time period.

7   BY MR. CANFIELD:

8        Q    Okay.  And what you're saying is that AT&T

9   had some changes in its methodology over time and --

10  but it didn't change the methodology for -- on a

11  bill-by-bill basis?

12       A    That's true.

13       Q    And except for those nuance changes in

14  methodology that you mentioned, the means by which

15  the risk management overhead charge on bills sent to

16  damagers would be the same for each class member;

17  correct?

18       A    I think that's true.

19       Q    Okay.  And what are the nuance changes and

20  methodologies that you're referring to?

21       A    I kind of put them into a couple different

22  categories.  The first would be, the original

23  methodology for allocating the cost pool was based

24  on the dollar value of labor in the aggregate on

25  damage claims.
```

James D. Hinson, et al. v. AT&T Services, Inc., et al.
Ian Ratner                                                                 April 03, 2015

Page 23

1            So to give you an example, so if the cost

2    pool was $4 million, and the labor value on damage

3    claims was, let's say, $20 million for all the

4    claims that were sent out, the -- you know, a lot of

5    claims sent out.  If you just aggregated the labor

6    part -- let's say it was $20 million.  That would be

7    a percentage ratio.

8            So you'd have $4 million in the cost pool.

9    You divide 4 million by 20 million, and you get a

10   ratio.  And that would be -- they would then apply

11   that ratio to the labor rate hour, the actual labor

12   rate hour.

13        Q    And what do you mean by "cost pool"?

14        A    The cost pool -- that's actually the --

15   probably the most important concept, is that --

16   there's a department that's consumed with dealing

17   with these damage events.  And that department has a

18   certain number of people in it.  And the cost pool

19   is essentially the payroll for those people.

20           So if you have 50 people working in that

21   department, and they take $4 million of payroll, or

22   if there's 60 people, and it's 5 million of payroll,

23   that's the pool that you're allocating out.  So the

24   cost pool is a cost accounting concept which is kind

25   of the beginning of the whole thing.

Page 24

1       Q    Okay.  And by "cost pool" in connection

2   with this risk management overhead charge, you're

3   talking about the portion of the AT&T claims

4   department that works on the billing and collecting

5   process for damage to its facilities?

6       A    Yeah.  It's actually -- I look at it a

7   little differently.  It's like -- they have a

8   department, the risk management department.  And

9   then, boom, there's a subset of people dealing with

10  this.  And those are the people that are the cost

11  pool.  That's actually a nuance that sometimes I

12  think is lost in this case a little bit.

13          Sometimes overhead rates are developed

14  without regard to the recovery of a cost pool, okay?

15  So a company says, you know, "We're going to make a

16  pen.  And we want to include some factor for

17  overhead.  And we're going to add on 10 percent.  We

18  think historically," blah, blah -- and they come up

19  with some metrics.

20          Here the rate is only based on the actual

21  cost pool or an approximation of the cost pool;

22  right?  Because some years they're using a prior

23  cost pool for a future allocation.

24          So the -- what -- the most important part

25  of this element is really what's the cost pool.  So

1    that's a little different than in other cost

2    allocation or in other overhead disputes that I've

3    been -- that I've seen.  Here you actually have a

4    cost pool.  We're just talking about how we're

5    divvying it up; right?

6            So in the beginning, they're developing a

7    ratio of the cost pool based on the total labor

8    hours in the claims; okay?

9            The first nuance change is they later take

10   the cost pool and just divide it by the number of

11   hours done on the damage events.  Not hours in the

12   department, but hours on the damage claims.

13           So in the beginning, it's the dollar

14   value, the 20 million -- remember, I said before

15   assume that all those -- those -- all those claims

16   that went out added up to -- 20 million was for

17   labor and maybe 80 million was material and

18   contractors, whatever.

19           So the first methodology is just, "Hey,

20   we're going to figure out our ratio.  And then we'll

21   add that ratio to the actual labor rate hours.  So

22   if somebody is paid $18 an hour, we'll add that

23   ratio to recover our cost pool."

24           Later they say, "You know what?  Let's

25   take that $20 million and let's divide it by 500,000

Page 26

1    hours.  And we'll figure out a -- we'll figure out a

2    dollar rate per hour to add to the hours worked on

3    those damage events."

4            So it's a little of a nuance.  I don't

5    know why they changed it.  It's just -- they just

6    changed it.  I mean, it doesn't really matter.  I

7    guess the -- it may be easier to communicate to

8    people on a per-hour basis than a ratio.

9        Q    When was that change made?

10       A    I have a note -- I have one of my loose

11   papers here that will remind me.  They made that

12   change sometime in 2011.

13       Q    Okay.

14       A    Here are -- our notes say -- my

15   spreadsheet tells me it looks like they made that

16   change in July 2011.

17       Q    Okay.

18       A    Okay.  So then, you know, another nuance

19   change -- again, these are all methodological

20   changes, where they're applying it in a uniform

21   basis from a forensic accounting perspective.  It's

22   not like they're changing it on each claim.  It's --

23   there's a methodology, however you come up with the

24   methodology.  Then we're applying it.

25           The third nuance change that I noticed is

James D. Hinson, et al. v. AT&T Services, Inc., et al.
Ian Ratner

April 03, 2015

Page 30

1    mean, it's really two modifications to the beginning

2    of time.  If you say in the beginning they're doing

3    it based on a -- for this particular category, risk

4    management overhead, in the beginning, if they're

5    doing it on a -- if they're doing it as a ratio, and

6    then the first change is to make it on a

7    dollar-per -- a dollar-per-hour basis, and then

8    further to refine that, it would be two changes to

9    the original methodology.

10        Q    Okay.  And we've talked about those

11   things?

12        A    Yes.

13        Q    And --

14        A    There may be other refinement, but I'm

15   just not remembering it.  I don't know.

16        Q    And in terms of what goes into this risk

17   management overhead charge, I think you've said that

18   that is largely the salaries of the people in the

19   risk management department that are allocated to the

20   damage incidents.  Is that right?

21        A    It's just the direct charge.

22        Q    So is it entirely salaries?

23        A    Yes.

24        Q    And how many employees are we talking

25   about whose salaries -- give me an estimate of how

Page 31

1    many salaries we're talking about that make up the

2    risk management overhead charge.

3         A    Well, I think it changes over time.  And

4    that's why you're using ratios.  Because everything

5    is changing; right?  Two thousand and -- you know,

6    there's a lot less dollars and less claims in 2012,

7    for example, than in, you know, 2008 and '09,

8    because construction is -- is -- I mean, we have a

9    table in the report of the claims.  And you can see

10   there's changes in it.

11        I think you're talking about -- you know,

12   in one year I think there was 65 employees.  In one

13   year there was 90 employees, or a percent of those

14   90 employees were dealing with this.  So it's those

15   kind of numbers.  Those types of order of magnitude,

16   I should say.

17        Q    And risk management overhead is an

18   indirect cost; is that true?  Or is it a direct

19   cost?  I'm not sure.

20        A    Well, you know, by the nature of it, it

21   would be assumed to be.  But even within the risk

22   management department, you're going to have indirect

23   costs, because some of the corporate overheads from,

24   you know, AT&T shared services get there.  But they

25   don't include that in their allocation of the cost



Page 37

1    infrastructure.  The concepts are well -- the

2    concepts of fully-distributed costing, cost

3    allocation, or absorption costing -- whatever you

4    want to -- you know, there's many terms for it.

5    They have quite a rigorous infrastructure or

6    rigorous concepts that they actually do it.

7         Q    Okay.  And so if the risk management

8    overhead costs were allocated to the entire cost

9    structure of AT&T, then that risk management cost

10   would be negligible if it were treated as part of

11   corporate overhead; correct?

12        A    Well, it would be part of a larger cost

13   pool, and it would be allocated to more events.

14   That's probably a better way to say it.

15        Q    Okay.  And the -- you've read

16   Mr. Johnson's deposition; right?

17        A    Yes.

18        Q    And as I recall, Mr. Johnson testified

19   that if risk management overhead charge were

20   allocated across the entire cost structure of the

21   company, rather than just the damage activities,

22   that you'd have to carry out the calculation to six

23   decimal places to try to figure out how much you

24   would -- how you would allocate the risk management

25   overhead.  Would you agree with that?

Page 38

1        A     Yeah.  I mean, it's how you pick which

2    activities -- I mean, it's a different calculation.

3    It's small.

4        Q     The risk management overhead would be a

5    very small portion of general corporate overhead.

6    Would you agree?

7        A     I do agree.

8        Q     Negligible?

9        A     I think it's -- we know the absolute

10   number of the cost pool; right?  Eight million, nine

11   million, whatever the cost pool is.  Their current

12   corporate overhead methodologies include things that

13   are smaller than that.  So even though it's a small

14   number, it would be captured in the methodology.

15       Q     I know it would be captured, but I'm just

16   trying to get some sense of how important risk

17   management overhead would be in terms of the

18   corporate overhead of the company.  Do you know what

19   the total general corporate overhead of AT&T is?

20       A     I can't recall it.  In Hinson I, I knew

21   that number.  It's a big number.  This would be a

22   small number.

23       Q     If you were going to -- as part of general

24   corporate overhead, the portion attributed to damage

25   activity reflected in the risk management charge

Page 39

1    would be negligible?

2        A    I think it would be a rounding, yeah.

3        Q    A rounding error?

4        A    Yeah.

5        Q    So negligible?

6        A    Yeah.

7        Q    You'd agree with that?

8        A    Yes.

9        Q    And because risk management overhead is

10   allocated only to damage activities, risk management

11   overhead is a much larger portion of the bill that

12   goes to damagers than if it were allocated only as

13   part of general corporate overhead.  Would you

14   agree?

15       A    I think mathematically that's true.

16       Q    And is it your testimony that AT&T is

17   required to treat risk management overhead

18   differently than it treats general corporate

19   overhead for purposes of allocating it to damages

20   activities?

21       A    I don't think I said that.

22       Q    Do you have an opinion on that?

23       A    My opinion is that they have a rigorous --

24   well, my opinion is that they're not -- there's no

25   regulation.  I don't believe there's a regulation

Page 40

1  that requires them to do that, or that they're -- or

2  that -- that there's some SEC or regulatory reason

3  that it has to be that way.  I don't believe that's

4  the case.

5        I do believe that they have a rigorous

6  sophisticated cost allocation system.  And just as a

7  matter of fact, what they're doing from a cost

8  accounting perspective is better than lumping this

9  into corporate overhead.  Just as a very high -- I

10 don't even think I make that opinion here, because

11 to me it's such a basic opinion.

12        What they're doing now is much better.  It

13 may not be perfect.  But in the universe of zero to

14 100, it may not be a hundred.  But it's

15 substantially better than the proposition that I

16 think you're making which says, "Oh.  We'll just

17 lump it in with corporate overhead."  I know -- I

18 know that you didn't necessarily ask me that, but I

19 just want to get that on the record.

20      Q    And all I'm trying to establish is that

21 it's AT&T's choice to treat risk management overhead

22 in the way that they've done it, as opposed to just

23 treating it as part of general corporate overhead.

24      A    I believe that's true.

25      Q    And, in fact, it's true that AT&T before

Page 41

1    2006, treated risk management overhead as part of

2    general corporate overhead in calculating bills to

3    damagers; isn't that true?

4         A    I think that's true.

5         Q    And was that a reasonable way for them to

6    do it -- for AT&T to do it prior to 2006?

7         A    I mean, again, it's part of refining.

8    It's -- it was a cost and it was included in the

9    cost allocation models.  But, again, you're trying

10   to get to the best answer in anything you do.

11   You're always improving.

12        So the fact that they improved the model,

13   it's -- they should be complimented.  I mean,

14   they're getting more -- they're getting better at

15   what they do.  I mean, that's the goal.

16        Q    And my question wasn't whether or not it's

17   better to do it the way AT&T does it now versus the

18   way they did it before 2006.

19        My question is whether it was reasonable

20   for AT&T to have done it the way it did it before

21   2006?

22             MR. JETT:  And, Ken, I'm going to

23        object to the form.  And the reason why, I will

24        tell you, is, as we've done in previous

25        depositions, you can't just say AT&T, unless we

Page 51

```
 1        A     Yes, sir.

 2        Q     And it shows that the direct labor cost

 3   was $1,418.60; correct?

 4        A     Yes.

 5        Q     And the -- there were two charges that

 6   were added to that, the corporate overhead and the

 7   risk management overhead; correct?

 8        A     Right.

 9        Q     And we call those the loadings?

10        A     Yes.

11        Q     Okay.  And the amount of the corporate

12   overhead loading on this bill was $346.32?

13        A     Yes.

14        Q     And the amount of risk management overhead

15   was $179.18?

16        A     Right.  Eight -- eight -- $8.74 an hour.

17        Q     Okay.

18        A     Which coincidentally is -- agrees to our

19   summary here, which is good.

20        Q     The way you would figure out what

21   percentage of the total labor charge, the $1,944.10,

22   what percentage related to the loadings, you would

23   take that total charge and divide it by -- or you

24   would take the two indirect -- let me start again.

25              You would take the loadings and divide it
```

Page 53

1        Q      All right.

2        A      Of that $526, $179, or $8.74 an hour, was

3   the corporate overhead.  That resulted in 34 percent

4   of the total -- 34 percent of the total --

5   34 percent of the total loadings being specifically

6   identifiable to the department.

7        Q      Okay.  So risk management overhead for

8   this bill would be 34 percent of the total loading;

9   correct?

10       A      That's true.

11       Q      Let's turn to Table 14 in your report.

12  And that is the -- another analysis of the -- a bill

13  sent to Callaway Grading; correct?

14       A      I'm sorry.  I was just looking at another

15  math here.

16       Q      All right.  Table 14 on your report --

17       A      Yes.

18       Q      -- that's an analysis of the bill relating

19  to Callaway Grading?

20       A      Yes.

21       Q      And the -- if we went through the analysis

22  on that bill to find out what percentage of the

23  total loading reflected risk management overhead,

24  could you give us that number?

25       A      Sure.  I mean, it's going to be a bigger

Page 54

```
 1   percentage, but I'll tell you that.  That is about
 2   43 percent.
 3        Q    And if you turn down to Table 15 -- which
 4   is an analysis of the claim for Hinson Electric;
 5   correct?
 6        A    Yes.
 7        Q    And that shows that the risk management
 8   overhead is more than 50 percent of the total
 9   loading?
10        A    Yes.
11        Q    Now, do you know why there's -- on a
12   bill-by-bill basis, there can be a variation in the
13   percentage that risk management overhead reflects of
14   the total loading?
15        A    Absolutely.
16        Q    Why is that?
17        A    Well, the -- it's all about the cost pool
18   that you're allocating; how much money are you
19   allocating to how much money in that given year.
20   So -- by the way, if -- let's first do one other
21   step, and it might help.  If you look -- let's look
22   at the -- Table 15; okay?
23        Q    Okay.
24        A    Okay.  So if you look at Table 15, you'll
25   see that the risk management overhead is $18.45 per
```

Page 70

1          about a five-minute break.

2                    MR. JETT:  I think we should take a

3          ten-minute break.  Like I said, I'm going to

4          try the court while you're here just so we can

5          have that conversation.

6                    (A recess was taken.)

7      BY MR. CANFIELD:

8          Q    Mr. Ratner, let's talk for a little bit

9      about loss of use.  Now, AT&T has used common

10     methodology for calculating loss of use during the

11     period from July 1st of 2008 until the present;

12     correct?

13         A    Yes.

14         Q    And loss of use is not included in every

15     bill; right?

16         A    Correct.

17         Q    It depends on the type of equipment that

18     is damaged and the circumstances that relate to the

19     damage itself as to whether there's a bill for loss

20     of use; right?

21         A    Circumstances -- yes.  And I think also

22     the -- they're -- my understanding is that they're

23     not charging loss of use unless there's been an

24     interruption of service or a presumed interruption

25     of service.

Page 71

1        Q     But when loss of use is included on a

2   bill, the same methodology is used to calculate it

3   in every bill; right?

4        A     Yes.  And I think there's been, again,

5   some refinements over time, the -- using which rate.

6   Maybe they were using the average rate for it, and

7   then they went to the lowest rate.  You know,

8   there's been some refinements, but I think the

9   methodology is consistent.

10       Q     And the same methodology would be used

11  with regard to loss-of-use charges that were paid by

12  every damager during the class period.  Would you

13  agree with that?

14       A     Yes.

15       Q     Okay.  What is loss of use?

16       A     It's a title for a claim that they've

17  calculated as, I suppose, a proxy for the value of

18  the facility or the value of the service that

19  they -- that is no longer available.

20       Q     Okay.

21       A     As if -- I guess, theoretically, as if

22  they had to either lease that from a third party or

23  to value the not having it available.

24       Q     Okay.  Loss of use is not an attempt to

25  recover a loss of revenue by AT&T as a result of the

Page 72

1    damage; would you agree with that?

2        A    I do agree with that.

3        Q    Before you got involved in this case, had

4    you had any experience with loss of use as an item

5    of damage in a lawsuit?

6        A    Only in a hotel case.  I had a couple of

7    cases involving hotel -- business interruption cases

8    in hotel loss cases, one in Savannah, a big case in

9    Charlotte.

10            And in those cases, I remember there

11   being, you know, lost revenue analysis, loss of use

12   analysis, big fight over deferral of use versus loss

13   of use, where people were charged with the value of

14   the rooms and things like that.

15       Q    Okay.  Are there accounting rules that

16   relate to the calculation of loss of use in this

17   context?

18       A    I don't think so.

19       Q    Okay.

20       A    I mean, I think it's more of a legal -- I

21   think it's more of a legal concept.

22       Q    Okay.

23       A    Insurance concept.

24       Q    Let's talk a little bit about your

25   opinions as you set them out in your report.  And if

James D. Hinson, et al. v. AT&T Services, Inc., et al.
Ian Ratner                                                    April 03, 2015

Page 83

1    they have a methodology, they apply the methodology,

2    they take the data -- they take actual data, they

3    apply the methodology in a consistent fashion.

4              There's a logic to what they do.  I

5    understand that there's a dispute around the logic,

6    but there is a logic that you could look to see this

7    is what they do.  And that's what I'm saying is

8    reasonable.

9         Q    AT&T's logic is reasonable?

10        A    Well, there is a logic.  There's a dispute

11   to the -- there's a dispute to the -- there's a

12   dispute to the -- there's a dispute to the logic of

13   what they do.  But they have -- they have taken the

14   position that that's what they want to bill for.

15   And the application of all those things is

16   reasonable.

17        Q    Okay.  And you don't have an opinion one

18   way or another as to whether AT&T -- whether it's

19   legally appropriate for AT&T to charge for loss of

20   use; is that true?

21        A    Correct.

22        Q    Okay.  Now, you're familiar with CAMS

23   database?

24        A    Yes.

25        Q    And the CAMS database shows on a

Page 84

1    damage-incident-by-damage-incident basis how much

2    risk management overhead has been paid; correct?

3         A    That's true.

4         Q    Okay.  And --

5         A    Well, it shows how it's been -- how the

6    payment has been applied --

7         Q    Right.  And there's --

8         A    -- to be more specific.

9         Q    So you can go into CAMS for a particular

10   bill and find out how much of the payment was

11   allocated to risk management?

12        A    Yes, sir.

13        Q    And you can do the same for loss of use?

14        A    Yes, sir.

15        Q    And so if Judge Corrigan ruled that it was

16   improper for AT&T to charge for risk management

17   overhead, using CAMS, you could run a query and get

18   the total amount of risk management overhead that

19   had been improperly collected; correct?

20                  MR. JETT:  Object to the form.

21                  THE WITNESS:  And I think we actually

22        give you some of the statistics.  I wouldn't

23        say it's been improperly collected.  We can

24        tell you how it's been applied.

25   BY MR. CANFIELD: